UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA RICCOBENE,<br><br>    Plaintiff,<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY,<br>and ANNE McCALL,<br><br>    Defendants. | C.A. No. 04-10256 PBS |

## DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, the Defendants, Massachusetts Bay Transportation Authority ("MBTA") and Anne McCall ("Deputy McCall") (collectively, "Defendants"), submit the instant Statement of Undisputed Material Facts in support of their Motion for Summary Judgment, filed herewith.

### I. SUMMARY OF THE PLAINTIFF'S CLAIMS

1. The Plaintiff, Lisa Riccobene ("Plaintiff"), was employed as a civilian Executive Assistant to former MBTA Police Chief Thomas O'Loughlin from March, 2001 through November, 2002. The Plaintiff alleges that during the course of her employment, she was subjected to a litany of derogatory communications and conduct motivated by her sex and her national origin (Italian). The Plaintiff alleges that the termination of her employment was in retaliation for her having complained of discriminatory treatment and for having been supportive of civil rights claims made against the MBTA by former Officer Helder Peixoto. The Plaintiff

201219.1



further claims entitlement to approximately 600 hours worth of overtime pay. See Complaint, Counts I through IX.

## II. PROCEDURAL HISTORY

2. The Plaintiff filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination ("MCAD") and the U.S. Equal Employment Opportunity Commission ("EEOC") on March 4, 2003, naming the MBTA, Deputy McCall, and William Fleming ("Deputy Fleming" or "Interim Chief Fleming") as respondents. See Plaintiff's Charge of Discrimination, a copy of which is attached hereto as Exhibit 1.

3. Upon receipt of the Plaintiff's Charge of Discrimination, the MBTA Department of Organizational Diversity/Civil Rights ("ODCR") initiated a parallel investigation into the Plaintiff's claims. On June 6, 2003, the ODCR notified the Plaintiff that it had concluded its investigation and that a finding of No Cause had been entered with respect to all of the Plaintiff's claims. See Letter from P. Jackson to M. Notis dated June 6, 2003 and ODCR Findings and Recommendations, copies of which are attached hereto as Exhibit 2.

4. On October 28, 2003, prior to the MCAD's issuing any determination as to probable cause or lack thereof, the Plaintiff notified the MCAD and the EEOC that she was withdrawing her claims from those agencies to pursue her claims in court. See Notice of Withdrawal of Claims dated October 28, 2003, a copy of which is attached hereto as Exhibit 3.

5. On February 6, 2004, the Plaintiff filed her Complaint with this Court against the MBTA and Deputy McCall, dropping her claims against Interim Chief Fleming.

## III. FACTS RELEVANT TO THE PLAINTIFF'S CLAIMS

<u>The Plaintiff Is Hired As Chief O'Loughlin's Executive Assistant</u>

6.   The Plaintiff began working for the MBTA Police Department on March 26, 2001 as a civilian Executive Assistant to former Chief Thomas O'Loughlin. Transcript of the Deposition of Lisa Riccobene (Volume I) ("Riccobene Dep. I") at p.34, copies of the relevant portions of which are attached hereto as Exhibit 4;[1] Transcript of the Deposition of Thomas O'Loughlin ("T. O'Loughlin Dep.") at p. 6, copies of the relevant portions of which are attached hereto as Exhibit 6.

7.   The Plaintiff's duties were largely secretarial and included providing clerical and administrative support to former Chief O'Loughlin, screening and prioritizing his calls and correspondence, maintaining his schedule and coordinating meetings. Her scheduled hours of work were from 7:00 a.m. to 3:30 p.m. The Plaintiff's desk was located just outside the Chief's office and she reported directly to him. Riccobene Dep. I at pp. 35-36, 48-49 (Ex. 4); T. O'Loughlin Dep. at pp. 6, 8-10 (Ex. 6); <u>see also</u> Executive Assistant Job Description (M000029), a copy of which is attached hereto as Exhibit 7.

8.   The Plaintiff and former Chief O'Loughlin have been "best friend[s]" for the past fifteen (15) years. Their close relationship pre-existed the Plaintiff's employment at the MBTA, continued during her employment at the MBTA, and continues to the present. They speak on the telephone every day and see each other every couple of weeks or as often as their schedules allow. Riccobene Dep. I at pp. 13-14, 16 (Ex. 4); T. O'Loughlin Dep. at pp. 7-11, 100 (Ex. 6).

---

[1] References to the Transcript of the Deposition of Lisa Riccobene (Volume II) will be made as "Riccobene Dep. II at p. ___.", copies of the relevant portions of which are attached hereto as Exhibit 5.

Lieutenant Nancy O'Loughlin

9. Lieutenant Nancy O'Loughlin has been employed as an MBTA police officer for approximately twenty-four (24) years. She attained the rank of Lieutenant in 1996 and has held that rank through the present, except for a brief interruption in service. Lieutenant O'Loughlin's present responsibilities include oversight of MBTA Police Department prosecutions. During the time when the Plaintiff was employed at the MBTA, Lieutenant O'Loughlin was the day shift commander in the patrol unit, located at MBTA Police Headquarters. Lieutenant O'Loughlin is related to former Chief O'Loughlin by marriage, as Lieutenant O'Loughlin's husband is a cousin of former Chief O'Loughlin. Deposition of Nancy O'Loughlin ("N. O'Loughlin Dep.") at pp. 6-9, copies of the relevant portions of which are attached hereto as Exhibit 8.

10. While the Plaintiff was employed at the MBTA, she had lunch with Lieutenant O'Loughlin approximately four (4) times per week and got together socially at least a couple times a week. The Plaintiff describes Lieutenant O'Loughlin as a "very dear" and "very close" friend with whom she speaks every day and sees every few weeks or as often as their schedules will allow. The Plaintiff is like a godmother to Lieutenant O'Loughlin's daughters, and acted as such at their confirmation. Riccobene Dep., Vol. I at pp. 15-16 (Ex. 4); N. O'Loughlin Dep. at pp. 18-19 (Ex. 8).

Deputy Anne McCall

11. Deputy McCall has been employed by the MBTA as a police officer since November 1983. During her tenure with the Police Department, Deputy McCall served as a patrol officer, detective, detective sergeant, and lieutenant. In 1997, Chief O'Loughlin appointed her to the command level position of Deputy Chief.[2] Transcript of the Deposition of Anne

---

[2] The position of Deputy Chief is not a civil service rank. Officers of any rank may be appointed to the position. As Deputy Chief, Lieutenant McCall retained her civil service rank of lieutenant.

4

McCall ("McCall Dep.") at pp. 4-7, a copy of the relevant portions of which are attached hereto as Exhibit 9.

### Interim Chief William Fleming

12.   Interim Chief Fleming has also been an MBTA police officer since 1983. He progressed through the ranks from patrol officer to detective sergeant then lieutenant. On or about 1998, Chief O'Loughlin appointed him to the position of Deputy Chief. As Deputy Chief, Fleming was primarily responsible for commanding the Criminal Investigations Unit of the MBTA Police Department. On August 8, 2002, following Chief O'Loughlin's departure, Deputy Fleming became Interim Chief of the MBTA Police Department. Transcript of the Deposition of William Fleming ("Fleming Dep.") at pp. 6-8, copies of the relevant portions of which are attached hereto as Exhibit 10.

13.   Until July 2002, when Chief O'Loughlin left the MBTA, both Deputy McCall and Deputy Fleming reported to Superintendent Thomas Komola, who reported directly to Chief O'Loughlin. Deputies McCall and Fleming had offices that were located down the hall from the Chief's office. Neither had any direct supervisory responsibility for Ms. Riccobene. Their interactions with her were generally limited to saying hello to her when they walked past her desk to get to the common area near her desk where their mailboxes were located or when they walked past her desk on their way to the Chief's office. McCall Dep. at pp. 4-7 (Ex. 9); Fleming Dep. at pp. 7-9 (Ex. 10).

### Chief O'Loughlin Resigns From The MBTA And The Plaintiff Goes Out On Compensatory Time.

14.   At the end of July 2002, Chief O'Loughlin resigned from the MBTA following a protracted period of tension between the Police Officers and Chief O'Loughlin concerning contract negotiations and management issues resulting in a vote of no confidence by the Police

5

201219.1

Officers. Within a few days of his departure, the Plaintiff absented herself from work and began using accrued vacation and compensatory time. Riccobene Dep. I at pp. 65-67 (Ex. 4).

15. On August 8, 2002, Deputy Fleming was appointed Interim Chief. In the Plaintiff's absence, Deputy Fleming asked Sharon April, who had been his administrative assistant while he was Deputy Chief, to perform the functions of Executive Assistant for him while he served as Interim Chief. Riccobene Dep. I. at pp. 68, 71-72 (Ex. 4); Fleming Dep. at pp. 18, 63-64 (Ex. 10).

16. In September 2002, after she had been out on compensatory time for about a month, the Plaintiff called Interim Chief Fleming and told him that she planned to remain out of work until she had used all of her compensatory time and, once that was exhausted, would resign her position in January 2003 without ever returning to work. Fleming Dep. at pp. 17-19 (Ex. 10).

17. Despite the Plaintiff's expressed intention not to return to work, Interim Chief Fleming encouraged the Plaintiff to return to work. Interim Chief Fleming met with the Plaintiff at the Quincy Center MBTA station where the Plaintiff had gone in order to have lunch with her close friend, Lieutenant O'Loughlin, who was based at that location. Interim Chief Fleming told the Plaintiff that he was creating an opportunity for her with a Vandal Squad to be headed by Lieutenant O'Loughlin, which would operate out of the Quincy Center MBTA station. Plans to establish a Vandal Squad at the Quincy Center MBTA Station did not materialize, however, due to budgetary reasons. Riccobene Dep. at pp. 68-70 (Ex. 4); Fleming Dep. at pp. 16-17, 21-22 (Ex. 10); T. O'Loughlin Dep. at p. 83 (Ex. 6).

18. As an alternative, Interim Chief Fleming offered the Plaintiff an opportunity to work as an Executive Assistant to Deputy Chief John Mahoney, who had indicated that he would welcome the Plaintiff in that role. The Plaintiff, however, rejected that assignment. Riccobene

Dep. I at pp. 70-72, 86-88 (Ex. 4); Fleming Dep. at pp. 22-25 (Ex. 10); N. O'Loughlin Dep. at p. 59 (Ex. 8).

19.   Soon thereafter, also in September 2002, Interim Chief Fleming had his weekly breakfast with MBTA General Manager Michael Mulhern to discuss how things were going as Interim Chief. Interim Chief Fleming asked Mr. Mulhern if Ms. April could receive a raise as she was performing the duties of Executive Assistant to the Interim Chief. Mr. Mulhern asked what had happened to the former Chief's Executive Assistant (i.e., the Plaintiff) and Interim Chief Fleming advised that she had been out using compensatory time for almost a month. Mr. Mulhern reminded Interim Chief Fleming that such extended compensatory time usage was against MBTA policy and directed him to contact the Plaintiff and tell her to return to work. Fleming Dep. at pp. 40-42 (Ex. 10); Transcript of the Deposition of Michael Mulhern ("Mulhern Dep.") at pp. 16-20, a copy of the relevant portions of which are attached hereto as Exhibit 11.

The Plaintiff Ignores Interim Chief Fleming's Directive To Return To Work

20.   On September 26, 2002, Interim Chief Fleming wrote a letter to the Plaintiff in which he told her that compensatory time would have to be taken in conformance with MBTA policy and provided her a copy of the policy, which stated that compensatory time could not exceed "one or two consecutive work days and can never be taken for an entire work week." At the time, the Plaintiff had taken as many as twenty-one (21) consecutive compensatory days off. Interim Chief Fleming ordered the Plaintiff to return to work no later than Monday, September 30, 2002. Despite this directive from the Interim Chief, the Plaintiff did not return to work. Fleming Dep. at pp. 45-48 (Ex. 10). See also Letter from W. Fleming to L. Riccobene dated September 26, 2002 with attached Compensatory Time Policy (M000076-77), attached hereto as Exhibit 12.

### The Plaintiff Is Included In The November, 2002 Layoff

21.     During the fall of 2002, the MBTA faced a severe budgetary shortfall and determined that a reduction in force was necessary. Only non-union administrative personnel whose layoff would have the least impact on the essential functioning of the MBTA were eligible for the layoff. MBTA Deputy General Manager, Joan Martin, and outside counsel, John Adkins, met with each MBTA department head and asked each to identify those persons from each department who met the criteria for inclusion in the layoff. Transcript of the Deposition of Joan Martin ("Martin Dep.") at pp. 7-12, copies of the relevant portions of which are attached hereto as Exhibit 13. See also Memorandum from J. Martin to M. Mulhern dated November 21, 2002 entitled 11/20/02 RIF Procedure (M001174-1176), a copy of which is attached hereto as Exhibit 14.

22.     To determine whom from the MBTA Police Department would be laid off, Ms. Martin and Attorney Adkins met with Interim Chief Fleming, as he was the MBTA Police department head. While reluctant to identify any names to be laid off, Interim Chief Fleming advised that the Plaintiff had been out of the office on compensatory time for several months, she did not plan to return, and that other executive assistants were performing the work of the department. Ms. Martin understood Interim Chief's Flemings remarks to be his recommendation that the Plaintiff satisfied the criteria for and should be included in the layoff. Fleming Dep. at pp. 60-64, 75-77 (Ex. 10); Martin Dep. at pp.17-21, 29 (Ex. 13).

23.     Ms. Martin and Attorney Adkins compiled the names that department heads had recommended to them for inclusion in the layoff and submitted the list, which included the Plaintiff's, to MBTA General Manager Michael Mulhern for approval. Mr. Mulhern ultimately approved approximately thirty-four (34) names for inclusion in the layoff, including the

201219.1

Plaintiff's. Mr. Mulhern did not have any discussion with anyone about whether or not the Plaintiff in particular should or should not be included or not in the layoff. Martin Dep. at pp. 20-22 (Ex. 13); Mulhern Dep. at pp. 6-16, 26-27 (Ex. 11).

24. On November 20, 2002, the Plaintiff was notified that due to a budget crisis, her employment with the MBTA was being terminated. At the time she received this notification, the Plaintiff had not been actively working at the MBTA since early August, 2002, and had already turned in her key and retrieved her personal property as she had intended to exhaust her compensatory time and not return to work. Fleming Dep. at pp. 65-69 (Ex. 10). See Letter from M. Mulhern to L. Riccobene dated November 20, 2002 (M00088), a copy of which is attached hereto as Exhibit 15.

25. The Plaintiff's belief that Deputy McCall was responsible for the Plaintiff being included in the layoff is just "speculation." In her deposition, the Plaintiff provided the following information as her sole basis for believing that her inclusion in the layoff was retaliatory:

Q: Do you believe that Anne McCall had anything to do with your inclusion in the layoff?

A: Yes I do.

Q: What do you believe she had to do with it?

A: I believe that she had the general manager's [Mr. Mulhern] ear because they were personal friends, and that when this whole thing of the layoff was coming down, I think that that [sic] – that was their structured way of getting rid of me.

Q: You believe that Anne McCall is a personal friends [sic] of Michael Mulhern?

A: Yes.

> Q: Other than that, do you have any reason to believe that she has some role in your inclusion in the layoff?
>
> A: No.
>
> Q: Are there any specific actions that you believe she took to include you in the layoff?
>
> A: I think that she went to Mike Mulhern based on, because Mike Mulhern knew all the stuff that was going on with Sonny [Helder Peixoto] and different things like that, and I think that they saw this as an opportunity.
>
> Q: Is this speculation?
>
> A: Yes. Yes.

Riccobene Dep. I at pp. 142-144 (Ex. 4).

26. Mr. Mulhern did not instruct Interim Chief Fleming to recommend the Plaintiff for inclusion in the layoff. The Plaintiff does not believe that Interim Chief Fleming discriminated against her in any way or retaliated against her in any way. Riccobene Dep. I at pp. 142-143 (Ex. 4); Mulhern Dep. at pp. 21-23, 26 (Ex. 11); Fleming Dep. at pp. 103-104 (Ex. 10).

27. The Plaintiff and Mr. Mulhern do not know each other. The only interaction they ever had was occasional telephone contact when she was the Executive Assistant to former Chief O'Loughlin. The Plaintiff does not believe Mr. Mulhern discriminated against her and has no basis to believe that he retaliated against her. Riccobene Dep. I at p. 144 (Ex. 4); Mulhern Dep. at pp. 21-22 (Ex. 11).

28. Deputy McCall does not have a social relationship with Mr. Mulhern and never spoke to him about the Plaintiff's being laid off. Deputy McCall was not involved in any way in

the decision to include the Plaintiff in the layoff and did not even find out about it until after the Plaintiff had been laid off. McCall Dep. at pp. 49-50 (Ex. 9); Fleming Dep. at p. 77 (Ex. 10); Mulhern Dep. at pp. 15, 26 (Ex. 11).

29. Ms. Martin did not discuss the Plaintiff's inclusion in the layoff with anyone except Interim Chief Fleming and Attorney Adkins. As such, she had no discussions with Mr. Mulhern or Deputy McCall about the Plaintiff. Martin Dep. at p. 30 (Ex. 13); Mulhern Dep. at p. 23 (Ex. 11).

### The Plaintiff's Allegations Of Discrimination

30. The Plaintiff alleges that Deputy McCall discriminated against her on the basis of sex because, in the Plaintiff's opinion, Deputy McCall was "cold, condescending, [and] a little abrupt" towards the Plaintiff. The Plaintiff believes that Deputy McCall behaved this way because, in the Plaintiff's opinion, the Plaintiff is "younger than [Deputy McCall], thinner than [Deputy McCall], [and] maybe a little bit more attractive than [Deputy McCall]." Riccobene Dep. I at pp. 96, 103-104 (Ex. 4).

31. The Plaintiff alleges that Deputy McCall discriminated against her on the basis of national origin (Italian) by allegedly calling the Plaintiff a "Mafia Princess" on one occasion. The Plaintiff alleges that she had heard from others in the police department (whom she could not identify) that Deputy McCall had used this term to refer to the Plaintiff on two or three other occasions, but admitted that these were just "rumors." The Plaintiff testified at her deposition that she understood the term "princess" to be an allegation that she was not a hard worker, and the term "Mafia" to be an allegation that her parents got what they had in life through illegal means. The Plaintiff confirms that no one else at the MBTA has ever made a derogatory reference to her ethnicity. Riccobene Dep. I at pp. 108-111, 122 (Ex. 4).

11

201219.1

32. Lieutenant O'Loughlin has never heard Deputy McCall make a derogatory remark about anyone. N. O'Loughlin Dep. at pp. 43-45 (Ex. 8).

33. The Plaintiff alleges that derogatory remarks about her sex and ethnic heritage were posted on an internet site. The internet site is not sponsored by the MBTA and contains anonymous derogatory postings about numerous MBTA police personnel of different races, genders and ethnicities. Riccobene Dep. I at pp. 122-125, 166 (Ex. 4); Fleming Dep. at pp. 31-34 (Ex. 10); N. O'Loughlin Dep. at pp. 30-31 (Ex. 8). See Internet Posting (M000062-63), a copy of which is attached hereto as Exhibit 16.

34. At the time the comments concerning the Plaintiff were posted, then Chief O'Loughlin wrote a memorandum to the MBTA's ODCR regarding the derogatory postings in which he listed the MBTA personnel who were attacked, including Deputies McCall and Fleming, the Plaintiff, and himself, and announced that he was instituting a computer forensic investigation into the incident. The letter was copied to the Plaintiff. See Memorandum from T. O'Loughlin to F. Ogelsby dated July 3, 2002, a copy of which is attached hereto as Exhibit 17.

35. When Deputy Fleming became Interim Chief, he directed Sergeant Gillespie to conducted an investigation concerning the postings. The investigation, also conducted by Sergeant Cowley, did not reveal the identity of the person(s) responsible for posting but did confirm that the postings were not done from MBTA department computers. Fleming Dep. at pp. 34 (Ex. 10). See also Memorandum from Sergeant Christopher Cowley to Deputy Chief Anne McCall dated May 7, 2003 ("Cowley Memo"), a copy of which is attached hereto as Exhibit 18.

36. The Plaintiff believes that Sergeant Salvatore Venturelli, who is Italian, may have had something to do with the postings about her because the Plaintiff understands him to be

201219.1

computer savvy and friendly with Deputy McCall. The Plaintiff admits that her subjective belief that Deputy McCall or Sergeant Venturelli had anything whatsoever to do with the internet postings is based on nothing but opinion and pure speculation. Riccobene Dep. I at pp. 105-106, 122-125 (Ex. 4).

37.     The Plaintiff alleges that on June 19, 2002 she noticed scratches and dents on the driver's door and driver's side rear quarter panel of her car which she believed were the result of vandalism. On July 23, 2002, the Plaintiff filed an MBTA accident claim report concerning the incident. The Plaintiff believes that "somebody at the MBTA Police Department" was responsible for the incident. She suspects that it was either Deputy McCall or "one of her little minions" but admitted that she really did not know. Former Chief O'Loughlin did not know who did it either. Riccobene Dep. I at pp. 147-150 (Ex. 4); T. O'Loughlin Dep. at p. 30 (Ex. 6). See Accident Claim Report and Police Report, attached hereto as Exhibit 19.

38.     The Plaintiff alleges that during the summer of 2002 her car was vandalized when someone poured a Coca-Cola on it. The Plaintiff told then Chief O'Loughlin about it who put up a camera in the parking lot to try and deter further incidents. The Plaintiff admits that she has no evidence whatsoever that Deputy McCall or anyone from the MBTA had anything to do with this incident or that it was motivated in any way by her gender, ethnicity, or in retaliation for anything she had done. Riccobene Dep. I at pp. 145-147 (Ex. 4); T. O'Loughlin Dep. at p. 40 (Ex. 6).

39.     Other employees of the MBTA had their cars stolen, vandalized or otherwise damaged while the employees were at work, including Deputy Fleming. T. O'Loughlin Dep. at p. 30 (Ex. 6). See also MBTA Police Department Journal (log) of Vehicle Damage, attached hereto as Exhibit 20.

13

201219.1

40. The Plaintiff alleges that, on one (1) occasion, her computer was "so badly hacked ... that it had to be replaced." The Plaintiff does not know who allegedly "hacked" into her computer. She theorizes that it could have been Sergeant Venturelli or Deputy McCall, but admits that her belief is based on nothing more than speculation. The Plaintiff believes that whoever did it was "snooping" to try and retrieve confidential information that she had stored on her computer in her capacity as Executive Assistant to the Chief. Riccobene Dep. I at pp. 37-38, 174-177 (Ex. 4).

41. Sergeant Cowley, the MBTA Police Department's information technology person, was not aware that the Plaintiff's computer was ever "hacked." The Plaintiff's computer was replaced along with the computers of other civilian staff as part of a general computer replacement program. Riccobene Dep. I at p. 173 (Ex. 4). See Cowley Memo (Ex. 18).

42. The Plaintiff alleges that on or about June, 2002, her cell phone was stolen while she was at work at the MBTA Police Station. She believes it was stolen, not lost, because she was talking on it on her way into the building that morning, and then it was missing, and when she retraced her steps, she could not find it. The Plaintiff does not know who, if anyone, took her cell phone. The Plaintiff has no basis for believing that Deputy McCall had anything to do with her cell phone's being stolen. Other employees at the MBTA have had items stolen while at work. Riccobene Dep. I at pp. 153-154 (Ex. 4). See MBTA Police Department Journal (log) reports of personal items being stolen while the employees were working, a copy of which is attached hereto as Exhibit 21.

43. The Plaintiff alleges that a "threatening note was placed at her desk." The note to which she refers reads: "THIS IS ONLY THE BEGINNING FATTY. PICTURES ARE NEXT OF THE SKINNY REAL GIRLFRIEND." The Plaintiff admits that she does not know who

14

201219.1

wrote the note or who left it on her desk. She found the note insulting to her character, but not a threat to her physical safety. Riccobene Dep. I at pp. 177-181 (Ex. 4). A copy of the note is attached hereto as Exhibit 22.

44.   At the direction of Deputy Fleming, who headed Criminal Investigations at the time, Detective Bruce Dolloff conducted an investigation and found that the only identifiable fingerprints on the note belonged to the Plaintiff. T. O'Loughlin Dep. at p. 40 (Ex. 6). See also MBTA Police Department Journal Incident Report dated July 1, 2002 and Memorandum from Detective Dolloff to File dated April 29, 2003, copies of which are attached hereto as Exhibits 23 and 24, respectively.

45.   The Plaintiff alleges that sexually derogatory remarks were published about her on the MBTA Police Department's text messaging paging system. The Plaintiff admits to never having seen the alleged derogatory comments, but alleges that she was told about them by MBTA Officer Danny Sullivan, her former boyfriend, and Lieutenant O'Loughlin. Riccobene Dep. I at pp. 166-167 (Ex. 4).

46.   Lieutenant O'Loughlin had a different paging system than others at the MBTA and never saw any derogatory remarks about the Plaintiff on any paging system. Lieutenant O'Loughlin believes that she was either told by an officer about the derogatory page or that she overheard an officer in the rank and file discussing it. N. O'Loughlin Dep. at pp. 24-25, 35-37 (Ex. 8). The MBTA investigated the Plaintiff's allegations of derogatory pages by reviewing the log of pages stored on shared modems, but did not discover any evidence of derogatory pages about the Plaintiff having been originated from MBTA computers See Sergeant Cowley Memo (Ex. 18).

47. During 2002 there was a lot of tension in the MBTA Police Department between then Chief O'Loughlin and the officers concerning contract negotiations and his management of the Police Department. The patrolmen issued a vote of no confidence in then Chief O'Loughlin which led to his resignation from the MBTA in July, 2002. Some of the tension directed at Chief O'Loughlin was transferred to those associated with him. To the extent that the Plaintiff was subjected to any unprofessional behavior, it was motivated by her close association with Chief O'Loughlin, as his best friend and Executive Assistant, not motivated by her gender or national origin. Riccobene Dep. I at pp. 131-136 (Ex. 4); Fleming Dep. at pp. 14, 42-43, 88 (Ex. 10).

The Plaintiff's Alleged "Protected Activity"

48. On September 26, 2002, the Plaintiff was interviewed by an attorney representing the MBTA in connection with what she believes to have been a worker's compensation claim filed by Officer Peixoto. The Plaintiff cannot recall what the whole thing was about or why she was there, only that she was ordered to attend, that it involved Sonny Peixoto and that the attorney called her a liar. The Plaintiff was out using compensatory time when she went to this interview, yet she still applied for additional compensatory time for having had to attend this meeting, which request was denied. Riccobene Dep. I at pp. 182-189 (Ex. 4); Riccobene Dep. II at p. 213 (Ex. 5).

49. On July 2, 2002, the Plaintiff was directed by Superintendent Komola to write a written report concerning an incident involving Deputy McCall and Officer Peixoto. The Plaintiff submitted a memorandum to Superintendent Komola titled "unprofessional behavior" wherein she stated that Deputy McCall gave a "verbal lashing" to Officer Peixoto, asked him "What's this your fucking favorite hang out kid?" and stated "Why don't you go fax something else to diversity?" The Plaintiff heard Deputy McCall "make some type of noise as she left."

16

201219.1

The Plaintiff's report does not oppose any discriminatory practice, was not submitted in connection with an MCAD or EEOC proceeding, and does not mention anything about Deputy McCall's allegedly calling the Plaintiff a "Mafia Princess." See Memoranda from L. Riccobene to Superintendent Komola dated July 8, 2002, a copy of which is attached hereto as Exhibit 25.

50. On July 2, 2002, Officer Peixoto also prepared a written report of the incident at the direction of Superintendent Komola. Despite being directed to provide all details of the incident, including who was present and who said what to whom, Officer Peixoto's report did not describe any remarks made by Deputy McCall to the Plaintiff. See Letter from Superintendent Komola to Officer Peixoto dated July 2, 2002 and Memorandum from Officer Peixoto to Superintendent Komola dated July 8, 2002, copies of which are attached hereto collectively as Exhibit 26.

The Plaintiff's Claim For Overtime Compensation

51. The Plaintiff alleges that during her one and one-half year employment with the MBTA, she accrued over six hundred (600) hours of overtime. Riccobene Dep. I at pp. 36-37 (Ex. 4). See also Plaintiff's Responses to Defendant's First Set of Interrogatories, No. 11, a copy of the relevant portion of which is attached hereto as Exhibit 27.

52. The Plaintiff understood that pursuant to the MBTA's compensatory time policy, she was entitled to earn compensatory time, but not money. The Plaintiff was satisfied with receiving compensatory time instead of money ("that was fine for me") and never asked for cash instead of compensatory time. The Plaintiff cannot recall whether or not she ever saw the MBTA's written compensatory time policy. Riccobene Dep. I. at pp. 55-56 (Ex. 4); T. O'Loughlin Dep. at p. 72 (Ex. 6); Martin Dep. at pp. 34-35 (Ex. 13).

53. The Plaintiff did not use any of her accrued compensatory time during former Chief O'Loughlin's tenure, except possibly a day here or there around holidays. After former Chief O'Loughlin left the MBTA, the Plaintiff used all of her accrued compensatory time. Riccobene Dep. I at pp. 59-60 (Ex. 4).

54. During her deposition, the Plaintiff described her accrual and use of compensatory time as follows:

> Q: You worked overtime; right?
>
> A: Yes.
>
> Q: The [MBTA]'s policy was that you could get comp time for that; right?
>
> A: Yes.
>
> Q: For all the hours that you worked?
>
> A: Right.
>
> Q: You used all the comp time?
>
> A: Yes.
>
> Q: That was fine with you?
>
> A: Yes.

Riccobene Dep. I at pp. 60-61 (Ex. 4).

55. The Plaintiff concedes that, to the best of her knowledge, the MBTA applied its compensatory time policy to her in the same way as it was applied to all other non-union administrative employees. The Plaintiff believed that she should have been entitled to the same benefits that union employees were entitled, but concedes that she was neither in a union nor ever sought to join one. Riccobene Dep. I at pp. 61-65 (Ex. 4).

201219.1

### The Plaintiff's Allegations That Deputy McCall Precluded Her From Obtaining A Job At the MBTA And A Job With The Boston Police Department.

56. In the late summer or early fall, 2002, former Chief O'Loughlin told the Plaintiff that there might be a position for her as Joan Martin's administrative assistant because Ms. Martin's current assistant was either going out on maternity leave or permanently leaving. Riccobene Dep. I. at pp. 89-92 (Ex. 4).

57. Joan Martin did not recall ever having had a conversation with former Chief O'Loughlin or anyone else about the Plaintiff's becoming her administrative assistant temporarily or permanently. Ms. Martin's executive assistant did go out on maternity leave, but Ms. Martin filled her role with temps until her administrative assistant returned. Martin Dep. at pp. 31-33 (Ex. 13).

58. Some time in 2004, almost two years after the termination of her employment with the MBTA, the Plaintiff applied for an administrative position with the Boston Police Department, but she did not get it. Former Chief O'Loughlin contacted the Boston Police Department and was told by someone in the personnel department that the Plaintiff would not be offered the position due to her pending litigation against the MBTA. Former Chief O'Loughlin does not know with whom he spoke at the Boston Police Department or who allegedly told the Boston Police Department about the Plaintiff's claims against the MBTA. T. O'Loughlin Dep. at pp. 96-98 (Ex. 6).

59. The Plaintiff believes that Deputy McCall had something to do with her not being offered a position with Ms. Martin and with the Boston Police Department, but admits that her beliefs are nothing but speculation. Riccobene Dep. I at pp. 242-247 (Ex. 4).

60. Lieutenant O'Loughlin is not aware of anything that Deputy McCall or Mr. Mulhern did to prevent the Plaintiff from getting another job within the MBTA or at the Boston Police Department. N. O'Loughlin Dep. at p. 72 (Ex. 8).

> Respectfully submitted,
>
> MASSACHUSETTS BAY TRANSPORTATION AUTHORITY and ANNE McCALL,
>
> By their Attorneys,
>
> _/s/ Walter B. Prince_
> Walter B. Prince (BBO #406640)
> Jeffrey A. Dretler (BBO #558953)
> Prince, Lobel, Glovsky & Tye LLP
> 100 Cambridge Street, Suite 2200
> Boston, MA 02114
> (617) 456-8000

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by first-class mail, postage prepaid, on 10-22-07

20

201219.1