UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 04-10256-PBS

**LISA RICCOBENE**
*Plaintiff*

v.

**MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY**
and
**ANNE McCALL**
*Defendants*

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Lisa Riccobene, through counsel, hereby opposes the Motion for Summary Judgment filed in this action by Defendants' Massachusetts Bay Transportation Authority ("MBTA") and Anne McCall. As grounds for this Opposition, Plaintiff states, in summary, as follows:

1. Plaintiff's overtime claims are not precluded by the MBTA's compensatory time policy. Specifically, neither the policy, nor Defendants' argument in its Motion for Summary Judgment, take into account the strict hourly limitation on the number of hours a public employer can grant as compensatory time for overtime work, rather than actually paying wages for overtime work, which is contained in 29 U.S.C. §207(o)(3) and 29 C.F.R. §553.21. At most, the MBTA's compensatory time policy would preclude Plaintiff from receiving overtime pay for 240 hours of the approximately 640 hours in overtime pay she is claiming. Furthermore, Plaintiff denies that the requirements for allowance of compensatory time set forth in 29 C.F.R. section 553.23(c) were met in this case, so that Plaintiff is entitled to be paid for the full 640 hours of overtime.

1

2. With regard to Plaintiff's claims of national origin discrimination, there is a genuine issue of material fact in dispute. Specifically, the genuine issue of material fact in dispute is whether or not Defendant McCall ever referred to Plaintiff using a name which was derogatory in terms of Plaintiff's national origin. This is a material fact, as if indeed the statement was made, it would provide direct evidence of discrimination by Deputy McCall against Plaintiff. Such direct evidence of discrimination, when combined with the other instances of disparate treatment alleged by Plaintiff (which might or might not be due to discrimination), is enough to create a jury issue of whether or not the hostile treatment of Plaintiff was due to her national origin.

3. There exists a genuine issue of material fact with regard to Plaintiff's claims of retaliation. Specifically, Plaintiff asserts that statements made by the former Chief of the MBTA Police Department (Chief Flemming) constitute an admission that Ms. Riccobene's layoff was illegal retaliation. Plaintiff asserts that this admission is binding upon the MBTA. The question of whether Chief Flemming made this statement is a material fact, as it would establish that the adverse action suffered by Ms. Riccobene (her layoff) was indeed taken in retaliation against her for protected activity (a memorandum she wrote regarding improper and discriminatory actions of Defendant McCall), and thus would establish that she had been subjected to illegal retaliation.

4. There are several genuine issues of material fact related to Ms. Riccobene's selection for layoff. Specifically, each of the individuals directly involved in the layoff decision (Chief Flemming, Ms. Joan Martin, and Mr. Michael Mulhern) deny that they were the one who actually made the decision to subject Ms. Riccobene to layoff, but state that one or more of the other of these three individuals made the selection. Accordingly, the statements of all three individuals regarding the identity of the person who selected Ms. Riccobene for layoff are inconsistent. Additionally, Chief Flemming has claimed that in the course of discussing Ms. Riccobene's position with Ms. Martin, he mentioned that Ms. Riccobene felt that she was being subjected to harassment. Ms. Martin denies that statement was made but acknowledges that it would have been important if actually said. In light of these inconsistencies, it would

be reasonable for a jury to assume that some combination of either Chief Flemming, Ms. Martin or Mr. Mulhern were being untruthful, that the reason advanced for Ms. Riccobene's selection for layoff was pretextual, and that the statements of these individuals regarding other aspects of Ms. Riccobene's claims of retaliation were untruthful as well.

**FACTUAL BACKGROUND**

Other than to the extent set forth below, Plaintiff does not object to the Statement of Facts set forth in Defendants' Motion for Summary Judgment. The facts with which Plaintiff either differs or facts which Plaintiff claims must be considered in addition to those facts set forth by Defendants, are the following:

**I.     MBTA Acting Chief of Police William Flemming admitted that the selection of Lisa Riccobene for layoff was retaliatory.**

A.     During the deposition of former MBTA Chief of Police Thomas O'Loughlin, former Chief O'Loughlin testified that he had been informed by Acting Chief Flemming that Acting Chief Flemming stated to Joan Martin and Michael Mulhern words to the effect that the layoff of Ms. Riccobene was wrong, that Ms. Riccobene had seniority and that her layoff would be viewed as retaliation. Chief Flemming used the word retaliation when speaking with Chief O'Loughlin. It was Chief O'Loughlin's understanding that Chief Flemming was referring to Ms. Riccobene's involvement in the Peixoto matters as the reason for the retaliation. See Plaintiff's Statement of Facts ("SOF") filed simultaneously with the Opposition, at par. I-A.

**II.     All of the MBTA management officials who might have been the individual who selected Lisa Riccobene for layoff, namely Chief Flemming, Joan Martin and General Manager Michael Mulhern, have denied being the individual who actually selected Ms. Riccobene for layoff and have identified one or more of the others of these three people as being the person who selected Ms. Riccobene for layoff.**

  A. Chief Flemming has denied that he was the person who decided to select Ms. Riccobene for layoff.  He has testified that he never recommended that Ms. Riccobene be laid off, and he has stated that he has no idea who actually made the decision to place Ms. Riccobene's name on a Layoff List. Chief Flemming stated that he played no role in the decision to select Lisa Riccobene for layoff and he has no idea who selected her. Chief Flemming has testified that he was not asked who he thought should be laid off if there had to be a layoff. In Chief Flemming's opinion, it would have made more sense to subject one of the "greeters" at the MBTA Police Department to a layoff rather than Ms. Riccobene. Chief Flemming told Joan Martin and the consultants he met with that there were two other employees who had less seniority than Ms. Riccobene.  SOF at par. II-A.

  B. Michael Mulhern testified that he played no role in deciding who would be on the Layoff List but that it would have been Chief Flemming who selected Ms. Riccobene's position for elimination.  Mr. Mulhern also testified that Joan Martin did not decide who would be on the Layoff List.  Mr. Mulhern testified that he had approved the selection of Lisa Riccobene for layoff based upon his belief that she had been selected for layoff by Chief Flemming.  SOF at par. II-B.

  C. Joan Martin testified that she had discussed the upcoming layoff with Chief Flemming and that he (Chief Flemming) gave her Lisa Riccobene's name for selection. Ms. Martin specifically testified that it was Chief Flemming who recommended Lisa Riccobene for layoff. Ms. Martin denied that she was the one who recommended that Ms. Riccobene be selected for layoff.  SOF at par. II-C.

**III. Chief Flemming informed both Michael Mulhern and Joan Martin that Lisa Riccobene was not at work because she believed she was being harassed, but neither Mr. Mulhern nor Ms. Martin commented about that statement or asked anything about it, despite the nature of their obligations and responsibilities as MBTA management officials.**

A.	Chief Flemming testified that when he met with a consultant and Joan Martin to discuss the selection of individuals for layoff, he stated to the consultant and Joan Martin that Lisa Riccobene was absent from work because she believed she was being harassed. However, neither the consultant nor Ms. Martin asked Chief Flemming any questions about that.  Prior to the selection of employees for layoff, when Chief Flemming met with General Manager Michael Mulhern and Lisa Riccobene's name came up, Chief Flemming stated to Michael Mulhern that Ms. Riccobene believed she was being harassed and was not coming into work.  Mr. Mulhern did not ask anything about that statement.  It was Chief Flemming's belief when he told Joan Martin that Lisa Riccobene believed she was being harassed, that Joan Martin said she knew about it.  SOF at par. III-A.

B.	Joan Martin testified that she did not recall Chief Flemming stating that Lisa Riccobene was not at work because she felt she was being harassed.  However, given Ms. Martin's position with the MBTA, this is something that she would recall if it had been said, and something she would have acted upon had it been said.  SOF at par. III-B.

**IV.  Lisa Riccobene was denied a job with the Boston Police Department, due to the MBTA informing the Boston Police Department that Lisa Riccobene had a lawsuit pending against it.**

A.	Former MBTA Chief of Police Thomas O'Loughlin contacted the Personnel Department of the Boston Police Department to determine the status of Lisa Riccobene's application for a job with the Boston Police Department.  In response he was asked if he "knew she was suing the MBTA."   SOF at par. IV-A.

B.	After Ms. Riccobene applied for a job with the Boston Police Department, she was called by the Boston Police Department and asked, "do you know that you have a lawsuit going at the MBTA."  SOF at par. IV-B.

5

**V.     Miscellaneous factual statements.**

    A.    Prior to Ms. Riccobene's selection for layoff, Chief Flemming stated to Ms. Riccobene that he could not keep her safe.  Ms. Riccobene understood this to mean that Chief Flemming could not care for her physical safety.  SOF at par. V-A.

    B.    Ann McCall was cold to Ms. Riccobene because Ms. Riccobene was Italian.  Ms. McCall called Ms. Riccobene a Mafia Princess.  Ms. Riccobene considered the term "Mafia Princess" to be derogatory, to be "derogatory to [her] ethnicity."  At other times Deputy Chief McCall referred to Ms. Riccobene as a "fucking secretary."  SOF at par. V-B.

    C.    Although Deputy McCall had no supervisory responsibility for Ms. Riccobene, after Ms. Riccobene submitted a statement about an incident between Officer Piexoto and Deputy McCall, Deputy McCall started examining Ms. Riccobene's timesheet.  SOF at par. V-C.

    D.    Ms. Riccobene was witness to an incident between Deputy McCall and Patrolman Piexoto, at which Deputy McCall made a quacking sound and referred to Officer Piexoto, who was of Portugese ancestry, as a "Portugoose."  Ms. Riccobene wrote a report which she submitted about this incident.  SOF at par. V-D.

    E.    Deputy McCall would ask all of the employees in her area to lunch except for Ms. Riccobene.  SOF at par. V-E.

    F.    Ms. Riccobene claims that she is entitled to 640 hours of overtime for which she was not paid.  SOF at par. V-F.

**ARGUMENT**

**I.     Plaintiff's Overtime Claims**

Defendants claim that they are entitled to Summary Judgment on Plaintiff's overtime claims under the Fair Labor Standards Act ("FLSA"), on the grounds that 29 U.S.C. §207(o) and 29 C.F.R. §553.23 allow public agencies to compensate employees for overtime work by granting them "compensatory time" rather than paying them actual overtime pay.  Defendants claim that

there was a valid agreement or understanding between Defendants and Ms. Riccobene regarding such an arrangement and therefore, pursuant to the FLSA and its regulations, there was no obligation to pay overtime payments to Ms. Riccobene.  Defendants are wrong.

Nowhere in the argument made by Defendants in their Brief is there any discussion of the limitations on the use of compensatory time in lieu of overtime pay, which are set forth in both 29 U.S.C. §207(o)(3) and 29 C.F.R. §553.23.  The statutory and regulatory limitation prevents the MBTA's compensatory time policy (to whatever extent it may be valid and to whatever extent Ms. Riccobene may or may not have received compensatory time for all of the overtime she worked) from barring all of the overtime pay Ms. Riccobene claims.[1]

The use of compensatory time in lieu of overtime payments by public entities, and the limitations on the use of compensatory time, are spelled out in 29 U.S.C. §207(o).

29 U.S.C. §207(o)(2)(b) provides that if the applicable "agreement" provisions of the statute are met, a public agency may provide compensatory time off in lieu of overtime "<u>if the employee has not accrued compensatory time in excess of the limit applicable to the employee prescribed by ¶(3)</u>."  (emphasis added)

The limitation itself is contained in 29 U.S.C. §207(o)(3)(A).  It reads as follows:
> "(3)(A) If the work of an employee for which compensatory time may be provided included work in a public safety activity, an emergency response activity, or a seasonal activity, the employee engaged in such work may accrue not more than 480 hours of compensatory time for hours worked after April 15, 1986. If such work was any other work, the employee engaged in such work may accrue not more than 240 hours of compensatory time for hours worked after April 15, 1986. <u>Any such employee who, after April 15, 1986, has accrued 480 or 240 hours, as the case may be, of compensatory time off shall, for additional overtime hours of work, be paid overtime compensation.</u>"  (emphasis added)

---

[1] Defendant MBTA does not claim that Ms. Riccobene was not entitled to the 640 hours of overtime for which she claims compensation on the grounds that the overtime was either not approved or not actually worked.  The only grounds for opposing the overtime claims which is set forth in the Motion for Summary Judgment, is the claim that the MBTA had the right to compensate Ms. Riccobene with compensatory time rather than with money.

7

Clearly, Ms. Riccobene was subject to the limitation contained in 29 U.S.C. §207(o)(3). A review of relevant portions of the Code of Federal Regulations reveals that Ms. Riccobene (as an Assistant to a Chief of Police) was not involved in either public safety activities, law enforcement activities or related activities. She is therefore subject to, at most, the 240 hour limitation.

Pursuant to 29 C.F.R. 553.24(c) the term "public safety activities" as used in §7(o)(3)(A) of the Act includes law enforcement, fire fighting or related activities as described in §§553.210(a)(b) and 553.211(a-c) and (f). "However, the 480 hour accrual limit will not apply to office personnel or to other civilian employees who may perform public safety activities only in emergency situations…" 29 C.F.R. section 553.24(c).

29 C.F.R. 553.211, dealing with and defining "law enforcement activities," states at §(g) the following:

> "Not included in the term "employee in law enforcement activities" are the so-called "civilian" employees of law enforcement agencies or correctional institutions who engage in such support activities as those performed by dispatcher, radio operators, apparatus and equipment maintenance and repair workers, janitors, clerks and stenographers."

Clearly, Ms. Riccobene was not involved in public safety or law enforcement activities when she worked for the MBTA Police Department. Therefore, to the extent she was subject to one of the compensatory time limitations contained in 29 U.S.C. §207(o), the limitation she was subject to was the 240 hour limitation.

The MBTA's policy on the granting of compensatory time cannot supercede either the FLSA or its regulations.[2]

In any event, it is beyond question that at best the argument made by the MBTA in its Motion for Summary Judgment regarding the payment of compensatory time to Ms.

---

[2] Plaintiff questions whether the MBTA's compensatory time policy has been consistently applied for many years and to many different employees, in violation of 29 U.S.C. §207(o). However, such issues are beyond the scope of the instant Motion.

8

Riccobene in lieu of overtime payments, would apply to at most 240 hours of the 640 hours of overtime for which she makes claim. Based upon the compensatory time limit contained in 29 U.S.C. §207(o), Ms. Riccobene is clearly entitled to be paid overtime, at the rate of one and one-half times her usual rate of pay, for at least 400 hours of work.[3]

Ms. Riccobene does not concede that the remaining 240 hours of overtime she claims are barred by the MBTA's compensatory time policy.

Ms. Riccobene's disagreement with the MBTA's arguments regarding even those amounts of compensatory time within the limitation of §7(0), is based upon the regulations carrying out the FLSA, and in particular 29 C.F.R. §553.23(c).

29 C.F.R. §553.23(c) provides that there may be an agreement or an understanding between a public agency and an individual employee providing that overtime will be compensated by the granting of compensatory time. The regulation states that although the agreement need not be in writing, a record of its existence must be kept. The regulation goes on to state that the agreement may take the form of "an express condition of employment," provided that the employee knowingly and voluntarily agrees to it as a condition of employment and secondly, that "the employee is informed that the compensatory time received may be preserved, used or cashed out consistent with the provisions of §7(0) of the Act."

The MBTA has advanced no evidence indicating that Ms. Riccobene was informed that her compensatory time could be "preserved, used or cashed out consistent with" the FLSA. Additionally, although the regulation states that an agreement or understanding can be "presumed to exist" when an employee fails to express an unwillingness to accept compensatory time off in lieu of overtime pay, nonetheless, "the employee's decision to accept compensatory time off in lieu of cash overtime payments must be made freely and without coercion or pressure." The MBTA has introduced no evidence that Ms.

---

[3] In light of the fact that the MBTA clearly was aware of the FLSA and its requirements, it seems likely that if she prevails upon her FLSA claim, Ms. Riccobene would also be entitled to liquidated damages and attorney's fees.

9

Riccobene accepted compensatory time off <u>in lieu of cash overtime payments</u> either freely or without coercion or pressure.  All the MBTA has indicated is that it had a policy, the policy was supposedly applicable to Ms. Riccobene, and therefore she was bound by it.

None of the 640 hour of overtime claimed by Ms. Riccobene are covered by the MBTA's compensatory time off policy.  The MBTA must make payment to Ms. Riccobene for all of the 640 hours of overtime she claims.

## II.     A Genuine Issue of Material Fact Exists as to Ms. Riccobene's Claim of National Origin Discrimination

One of the claims in the Complaint in this action asserted by Ms. Riccobene is that she was subjected to a harassing environment at work due to her ethnicity, Italian.  There exists a genuine issue of material fact with regard to this claim.

Specifically, Ms. Riccobene has asserted that on at least one occasion she was referred to by Deputy Chief of Police Anne McCall as a "Mafia Princess."  Ms. Riccobene has further testified that she considered such a statement to be "derogatory to [her] ethnicity," in other words, that she considered the remark to be offensive.

Ms. Riccobene has alleged a number of other actions on the part of Deputy Chief McCall which, whether or not they are based upon discriminatory animus, are hostile.  Specifically, Deputy McCall referred to Ms. Riccobene as a "fucking secretary," Deputy McCall kept track of and investigated Ms. Riccobene's timesheets despite the fact that she was not her supervisor, she was cold and rude to Ms. Riccobene, and she would engage in activities with other employees (such as buying everyone lunch) to the exclusion of Ms. Riccobene.

Although the activities other than the derogatory remark are not in and of themselves discriminatory, when viewed in the light of the direct evidence of discrimination presented by Ms. Riccobene (the derogatory remark), a reasonable inference arises that these various actions and remarks were indeed based upon hostility toward Ms. Riccobene due to her national origin.

10

This presumption is bolstered by the fact that, based upon Deputy McCall's making an ethnically derogatory remark to another employee (the "portagoose" remark to Portuguese Officer Peixoto) it is apparent that Deputy McCall has a propensity for bias against subordinates based upon their ethnicity.

When the direct evidence of discrimination is considered along with the other hostile actions, the conclusion must be that Ms. Riccobene was subjected to a hostile and harassing environment based upon her ethnicity.  To the extent that the defense against this claim is a denial that the derogatory remark was made, the question of whether the remark was made becomes a genuine issue of material fact preventing Summary Judgment on this issue.

### III.     There Exists a Genuine Issue of Material Fact with Regard to Plaintiff's Claim of Illegal Retaliation

Plaintiff Riccobene has claimed that in being subjected to the layoff, she was being retaliated against for having engaged in activities protected by either M.G.L. c.151B or 42 U.S.C. §2000(e).  In particular, Ms. Riccobene submitted an official report to her superiors detailing an incident in which Deputy Chief McCall had engaged in derogatory ethnic name calling and gestures against a subordinate.  This is the incident in which Deputy McCall got into a dispute with her subordinate Patrolman Peixoto, started quacking (apparently a reference to a goose), and referred to Officer Peixoto (who was of Portuguese ancestry) as a "portagoose."  In the report she wrote to her superiors  (although she did not refer to the use of the word "portagoose") Ms. Riccobene stated, among other things, that Deputy McCall had said to Officer Peixoto in an angry tone "why don't you go fax something else to diversity," and then made "some type of noise as she left." In the very least, Ms. Riccobene was reporting that Officer Peixoto was being treated in a hostile manner by his superior for something having to do with his having made complaints to "diversity," (the MBTA's Office of Diversity and Civil Rights).

In making this statement and submitting it to MBTA Managers, Ms. Riccobene was not only participating in the civil rights process, she was also affirmatively opposing discriminatory

11

practices. A colleague was being attacked for making civil rights complaints, Ms. Riccobene was opposed to such treatment, and she reported it in order to stop and prevent such treatment. Accordingly, Ms. Riccobene engaged in protected activity under M.G.L. c.151B and 42 U.S.C. §2000(e).

Similarly, there is no question that Ms. Riccobene was subjected to an adverse action. In November 2002, her employment with the MBTA was terminated when her position was eliminated due to a layoff.

The remaining question which needs to be answered for purposes of this Motion is whether Ms. Riccobene has adequately set forth a causal relationship between a protected activity and the adverse action. Plaintiff asserts that a genuine issue of material fact exists as to that third element. The genuine issue of material fact is whether the individual who was the Chief of the MBTA Police Department at the time of Ms. Riccobene's layoff, William Flemming, has admitted that Ms. Riccobene's selection for layoff was illegal retaliation against her.

During the course of discovery in this action, the deposition of former MBTA Chief of Police Thomas J. O'Loughlin took place. During the deposition at pages 86 to 89, the following colloquy occurred:

> Question: Did she say she believed whoever had signed the letter had made the decision to include her in the layoff?
>
> Answer: I remember she read something. You know, she read the letter to me -- as you read some of the information to me, I actually think it was Billy Flemming that said it to me. I don't think it was Lisa the one that said it to me.
>
> Question: Officer Flemming said what to you?
>
> Answer: He told me that he was called to 10 Park Plaza. That Mike Mulhern was there with John Martin. He was handed an envelope/packet with information in it, and he was told that he was to serve that on Lisa and she was being laid off. Billy, he indicated, he said to John Martin and Mike Mulhern to the effect, this is wrong. I think he was speaking on her behalf; that, you know, she has seniority over other people. That it's going to be viewed, I think he said, as retaliation.

12

And they told him she was being laid off and he was just to go do it and serve the papers on her.

Question:    He used the word retaliation?

Answer:    I believe he - - yeah, I believe he did.

Question.    Retaliation for what?

Answer:    I believe he was referring to her involvement in the Peixoto matters.

Question:    Not her association with you?

Answer:    I don't believe so.

Question:    Retaliation by whom?

Answer:    I believe Anne McCall and Michael Mulhern.

Question:    You believe that is what he meant or that is what you believe?

Answer:    I know what he said to me and he didn't say that to me. You asked me --

Question:    That's what you believe?

Answer:    That's what I believe, yes.

Question:    That's what you believe he meant?

Answer:    Yes.

Question:    And did you agree?

Answer:    Yes.

For the purposes of this Motion for Summary Judgment, the statements attested to by Thomas O'Loughlin in his deposition and attributed to then Chief Flemming are not hearsay statements but rather are admissions which are properly considered by this Court in ruling upon the pending Motion for Summary Judgment. At the time these statements were made by Mr. Flemming, he was the Acting Chief of the MBTA Police Department. He made these statements within the scope of his employment and within the scope of his

13

authority.  He had the authority to bind the Police Department on matters such as this and his statements are determinative on these issues.  See, e.g., Woodman vs. Haemonetics, 51 F. 3d 1087, 1094 (1st Cir. 1995); McDonough vs. City of Quincy, 452 F. 3d 8, 21 (1sr Cir. 2006).

At the time he made the statement, not only was Chief Flemming the highest management official in the MBTA Police Department but additionally, he had been intimately involved in the process by which Ms. Riccobene's position was selected for layoff.  The admission clearly states that Ms. Riccobene was selected for layoff due to "retaliation."  The reasonable inference, particularly in light of the statements of Chief O'Loughlin, is that this was retaliation for Ms. Riccobene's report regarding Deputy McCall's discriminatory actions against Officer Peixoto.

In his deposition, Deputy Flemming denied having made these statements about the selection of Ms. Riccobene for layoff being wrong or retaliatory.  Accordingly, a genuine dispute of material fact exists as to whether he made these statements (and thus whether there exists an admission which is binding upon Defendants that Ms. Riccobene's selection for layoff was illegal retaliation).  Accordingly, the Motion for Summary Judgment must be denied as to Ms. Riccobene's retaliation claim.

**IV.    There exist several genuine issues of material fact related to Ms. Riccobene's selection for layoff**

The evidence adduced during discovery made clear that the three individuals who were involved in determining which MBTA Police Department employees would be laid off in November 2002, were William Flemming, Joan Martin and Michael Mulhern.  At the time, Mr. Flemming was the Acting Chief of the MBTA Police Department, Ms. Martin was the Deputy General Manager for Employee Relations of the MBTA, and Mr. Mulhern was the General Manager of the MBTA.  As is discussed in the Defendants' Brief, the process for selecting individuals for layoff in 2002 was as follows:

 a. Department Heads would meet with Ms. Martin and one or more consultants who had been retained by the MBTA, in order to determine which positions in their particular MBTA departments would be eliminated;

 b. Ms. Martin prepared a list of positions to be eliminated based upon the recommendations of positions to be eliminated which were made to her by Department Heads;

 c. Ms. Martin presented the list of positions to be eliminated to General Manager Mulhern; and

 d. General Manger Mulhern deleted certain positions from the list, approved the elimination of the remaining positions, and made the final decision that the remaining positions on the list be eliminated.  Although no positions were conclusively eliminated without the approval of Mr. Mulhern, Mr. Mulhern was not involved in the actual selection of positions recommended for elimination.

According to Mr. Mulhern, he played no role in deciding who would be on the layoff list, but rather followed the recommendations of the Department Heads which were presented to him through Ms. Martin.  Although Mr. Mulhern did not have first hand knowledge of who placed Ms. Riccobene and her position on the layoff list, he testified that it would have been Chief Flemming who selected Ms. Riccobene's job for elimination.  Mr. Mulhern also testified that it was _not_ Ms. Martin who decided who would be on the Layoff List.  He approved the selection of Ms. Riccobene based upon his belief that she had been selected for layoff by Chief Flemming.

The summary of Mr. Mulhern's testimony is therefore that he did not select Ms. Riccobene for layoff,  Ms. Martin did not select Ms. Riccobene for layoff, and that it would have been Chief Flemming who selected Ms. Riccobene for layoff.

According to Ms. Martin, she discussed the layoff process with Chief Flemming, and it was he, Chief Flemming, who recommended that Ms. Riccobene be subjected to

layoff. Ms. Martin specifically testified that she was not the individual who recommended Ms. Riccobene for layoff.

The summary of Ms. Martin's testimony is therefore that she did not select Ms. Riccobene for layoff, but that it was Chief Flemming who had selected her for layoff.

According to Chief Flemming's sworn testimony the decision to select Ms. Riccobene for layoff was not his decision, the decision was made by Human Resources (presumably Ms. Martin), Chief Flemming never recommended that Ms. Riccobene be laid off, he had no idea who made the decision to put her on the Layoff List, he played no role in the decision to subject Ms. Riccobene to the layoff, and he was not asked who he thought should be laid off if there indeed had to be a layoff.

In summary, Chief Flemming's testimony is that he played absolutely no role in the decision to subject Ms. Riccobene for layoff, he did not make that decision, and either the decision was made by Human Resources or someone else of whom he is not aware.

Accordingly, the testimony of the three individuals who were involved in the decision to subject Ms. Riccobene to layoff is completely in conflict. It is apparent that one or more of these individuals are not being truthful. This also makes it reasonable to presume that the reasons being given by the MBTA for Ms. Riccobene's selection for layoff are merely a pretext for retaliation.

The existence of a genuine issue of material fact in dispute as to who it was that selected Ms. Riccobene for layoff, prevents Defendants' Motion for Summary Judgment from being granted as to the retaliation counts.

Similarly, there is conflicting testimony regarding the material fact of whether or not the decision makers involved in the layoff selection were aware that Ms. Riccobene had been claiming she was subject to harassment.

Chief Flemming testified that when he met with Joan Martin and her consultant to discuss positions at the Police Department, he informed Ms. Martin that Ms. Riccobene was not at work because she believed that she was being harassed. Chief Flemming testified that no questions were asked by Ms. Martin about this, and that he believed Ms. Martin had said she was aware of Ms. Riccobene's belief that she had been subjected to harassment. Chief Flemming also testified that when he spoke to General Manager Mulhern about Ms. Riccobene, he stated that Ms. Riccobene believed she was being harassed. Once again, Chief Flemming testified that Mr. Mulhern asked nothing about this statement having to do with harassment.

For her part, Ms. Martin testified that she did not recall Chief Flemming saying anything to her about Ms. Riccobene believing she had been subjected to harassment, but that given her position as Deputy General Manager for Employee Relations, if something like that had been said she would have acted on it.

If indeed the individuals involved in selecting Ms. Riccobene for layoff knew she claimed she was being subjected to harassment, but either ignored the matter or did nothing to investigate it (particularly given their positions as Chief of Police, Deputy General Manager for Employee Relations and General Manager), the inference arises that there was bias and hostility against Ms. Riccobene by these officials. This bias and hostility lends further support to the claim that the reasons advanced by the MBTA for Ms. Riccobene's layoff were just a pretext for retaliation.

Finally, deposition testimony reveals that Ms. Riccobene was denied employment by the Boston Police Department due to the MBTA informing the Boston Police Department that Ms. Riccobene had filed a legal action against the MBTA. Both former Chief O'Loughlin as well as Ms. Riccobene testified that when they called the Boston Police Department to find out about the status of Ms. Riccobene's application for employment, the individuals they spoke with in the Boston Police Department Personnel Division responded by asking them if they were aware that Ms. Riccobene

had filed a lawsuit against the MBTA. It is logical to assume that the Boston Police Department found out this information by calling the MBTA for a reference with regard to Ms. Riccobene. The MBTA thus apparently intentionally interfered with Ms. Riccobene's ability to obtain subsequent employment.

Whether or not the actions of the MBTA in interfering with Ms. Riccobene's ability to obtain a job with the Boston Police Department amounts, in and of itself, to illegal retaliation, it clearly shows bias against her. Once again, in light of this bias and animus against Ms. Riccobene, it must be presumed that the reasons advanced by the MBTA for Ms. Riccobene's selection for layoff are a pretext for retaliation.

**CONCLUSION**

For all the foregoing reasons it is respectfully requested that the Motion for Summary Judgment filed by Defendants be denied.

> Respectfully submitted,
> LISA RICCOBENE
> By her attorney,
>
> /s/Mitchell J. Notis
>
> _____
> MITCHELL J. NOTIS, BBO# 374360
> *Law Office of Mitchell J.Notis*
> 370 Washington Street
> Brookline, MA 02445
> Tel: 617-566-2700

**CERTIFICATE OF SERVICE**

I, Mitchell J. Notis, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent to any non-registered participants as indicated in the Notice of Electronic Filing, this 16th day of November, 2007.

/s/Mitchell J. Notis

_____
MITCHELL J. NOTIS, BBO# 374360
Law Office of Mitchell J. Notis
370 Washington Street
Brookline, MA 02445
Tel: 617-566-2700